UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
UNITED STATES OF AMERICA,

     -against-                 <u>MEMORANDUM AND ORDER</u>
                                   14-CR-0403(DRH)

SOFIA ATIAS and JOSEPH ATIAS,

            Defendants.
------------------------------X
A P P E A R A N C E S:

For the Government:
    Bridget M. Rohde
    Acting United States Attorney
    Eastern District of New York
    100 Federal Plaza
    Central Islip, New York 11722
      By: Charles P. Kelly, A.U.S.A.
          Burton T. Ryan, Jr., A.U.S.A.

For Sofia Atias:
    LaRusso Conway & Bartling, LLP
    300 Old Country Rd, Suite 341
    Mineola, New York 11501
      By: Robert P. LaRusso, Esq.

For Joseph Atias:
    Leonard Lato, Esq.
    200 Motor Parkway Suite, C-17
    Hauppauge, New York 11788-3756

HURLEY, District Judge

      On March 30, 2017, a jury convicted the defendants Sofia Atias ("Sofia") and her husband Joseph Atias ("Joseph") of the crimes charged in Counts One and Two (Bank Fraud and Conspiracy to Commit Bank Fraud), as well as Count Four ("Theft of Government Funds") of the captioned indictment.

      Sofia has moved pursuant to the Federal Rules of Criminal Procedure for (1) a judgment of acquittal pursuant to

Rule 29(c) as to each of the counts of conviction[1] and (2) a new trial as to those counts pursuant to Rule 33. Joseph has moved for a judgment of acquittal as to Count Four under Rule 29(c) and for a new trial pursuant to Rule 33 for the bank fraud and bank fraud conspiracy counts. (Joseph's July 12, 2017 Reply (Doc. # 256) at 23.)

                    GROUNDS ADVANCED BY SOFIA AND JOSEPH
                    IN THEIR JOINT APRIL 6, 2017 LETTER
                    FOR THE RELIEF REQUESTED

        The Atiases' Rule 29 motion, as delineated in their April 6th letter, is based on the purported insufficiency of the evidence. Their Rule 33 motion, i.e. for a new trial, rests on multiple grounds, to wit "(1) [Nicholas] Pellegrini's testimony was so patently incredible that no rationale [sic] jury could believe it; (2) the Court erroneously charged the jury on willful blindness or conscious avoidance; (3) the Court failed to charge the adverse inference from the government's failure to call Carlos Roa Zarate ('Zarate'); (4) the Court improperly ruled that Zarate properly invoked his Fifth Amendment privilege on other

_____

        [1]  Whether Sofia's Rule 29(c) motion targets all three counts of conviction or only Count Four is unclear.  In defendants' joint submission of April 6, 2017, judgments of acquittal are sought as to Counts One, Two and Four.  (Defs.' Apr. 6, 2017 Letter in Supp. (Doc. # 239) at 1.)  But in her June 2, 2017 individual Reply she explains "[d]efendant's Rule 29 application is premised upon the insufficient evidence of the theft of government funds (Court Four)."  (Sofia's June 2, 2017 Reply (Doc. # 253) at 1; but see id., "Conclusion", at 31.) Given the lack of clarity, the sufficiency of the evidence will be addressed as to Counts One, Two and Four.

short sale criminal acts particularly in commission with the
government's witness Nicholas Pellegrini ('Pellegrini') thus
preventing the defendants from eliciting substantial impeachment
evidence on . . . Pellegrini's credibility; and (5) <u>the Court
improperly curtailed Pellegrini's cross-examination by precluding
leading questions of Sofia Atias by the co-defendant's attorney</u>[2]
and curtailing Pellegrini's cross examination regarding a
perpetrated vehicle insurance and identification fraud, matters
certainly . . . relevant to Pellegrini's credibility."  (Defs.'
Apr. 6, 2007 Letter in Supp. (Doc. # 239) at 1-2 (emphasis
added).)

    Following receipt of the government's April 21, 2017
letter in opposition to the relief requested, movants Sofia and
Joseph replied individually via submissions dated June 2, 1017
and July 12, 2017 respectively.  In doing so, each supplemented
the grounds advanced in their April 6th joint letter.[3]

ADDITIONAL GROUNDS ASSERTED BY
<u>SOFIA IN JUNE 2, 2017 SUBMISSION</u>

    The Rule 33 additions by Sofia were as follows: (1)
"prosecutorial misconduct, including, inter alia, the
government's mischaracterization of the evidence at trial and its

---

    [2]  The underlined portion of defendants' objection # (5),
which apparently suffers from a scrivener's error, is non-
decipherable.

    [3]  Following the jury's verdict on March 30, 2017, Joseph
hired replacement counsel, Leonard Lato, Esq.

rebuttal summation and the government's presenting and failing to correct perjured testimony", (Sofia's June 2, 2017 Reply (Doc. # 253) at 1-2), (2) Court's "curtail[ment] of advice of counsel argument," (<u>id.</u> at 26 (capitalization omitted)), (3) government's "fail[ure] to turn over exculpatory information," (<u>id.</u> at 27 (capitalization omitted)), (4) "curtailing defendants' cross examination of two witnesses," namely Lee and Sofia, (<u>id.</u> at 30 (capitalization omitted); <u>see also</u> <u>id.</u> at 31), and (5) "government's fail[ure] to correct Pellegrini's testimony that he provided emails to government," (<u>id.</u> at 31 (capitalization omitted)).

Sofia also expanded her initial Rule 29(c) insufficiency argument.

ADDITIONAL GROUNDS ASSERTED BY<br><u>JOSEPH IN JULY 12, 2017 SUBMISSION</u>

As to Joseph's Rule 29(c) motion, his July 12th Reply includes the argument that the government has failed "to show that the Atiases were ineligible for Medicaid benefits exceeding $1,000." (Joseph's July 12, 2017 Reply (Doc. # 256) at 2.) In making that argument, counsel focuses on the testimony of Heather Griffin ("Griffin")[4], who was recalled to the stand as part of the government's rebuttal case for purposes of providing her assessment of the testimony of defendant's expert, Moriah Adamo

---

[4] Griffin was an "assistant director" of the Nassau County Department of Social Services (Tr. at 382-83.)

("Adamo").  Joseph maintains that a juxtapositioning of their testimony indicates that Griffin implicitly withdraw her "'ineligibility conclusion'" thereby leaving unchallenged Adamo's opinion that eligibility for Medicaid "could not be determined without further investigation".  (Id. at 2-3.)

With respect to Joseph's predicates for his Rule 33 motion the following claimed areas of error, beyond those listed in the April 6th joint letter, are cited: (1) the Court's erroneous ruling concerning Zarate's fifth amendment rights was compounded by it not ordering the government to immunize Zarate, (2) the Court's erroneous conclusion that there was a cumulative aspect to the testimony the defense sought to elicit from Zarate under Rule 608(b), (3) the government was aware of perjured testimony given by defense witness Charles Strain yet no action was taken to address the situation, (4) the government in its summation improperly underscored the testimony of both Pellegrini and Stain even though they knew or should have known of the perjurious taint of the subject testimony, and (5) even though Strain was called to the stand by the defense, the argument is made that the government thereafter made him their witness via their line of inquiry on cross examination, thereby triggering a duty to disclose any 3500 material or Giglio material in its possession.  (See generally Joseph's July 12, 2017 Reply (Doc. # 256) at 4-23.)

-5-

APPLICABLE LAW

1.  Rule 29(c) Motion for Judgment of Acquittal

        Rule 29 provides in pertinent part that "the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. of Crim. P. 29(a).  In deciding a Rule 29 motion, a court is required to construe all the evidence and draw all inferences in favor of the government.  See United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).  As a result, "[t]he court may not assess witness credibility, resolve inconsistent testimony against the verdict, or otherwise weigh the significance of the evidence."  Mehler, Gleeson and James, Federal Criminal Practice: A Second Circuit Handbook, § 29-2 at 511 (Lexis Nexis, 12th Ed. 2012), and cases cited therein.  For a movant to prevail, he or she must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. Vasquez, 271 F.3d 364, 370 (2d Cir. 2001)(citation and internal quotation marks omitted).

2.  Rule 33 Motion for a New Trial

        Federal Rule of Criminal Procedure 33 provides in pertinent part:

> Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. . . .

Fed. R. Crim. P. 33.

In deciding whether to grant a motion for a new trial under Rule 33, the test is "whether 'it would be a manifest injustice to let the guilty verdict stand.'"  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)(quoting United States v. Reed, 875 F.2d 107, 114 (7th Cir. 1989)).  Before ordering a new trial under Rule 33, a district court must find that there is "a real concern that an innocent person may have been convicted." Id.; see also United States v. Morales, 902 F.2d 604, 606 (7th Cir. 1990)(Posner, J.)(describing order of new trial as a response to "a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted"); United States v. Thomas, 894 F. Supp. 58, 63 (N.D.N.Y. 1995)(district court should only grant a new trial "when it 'concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred'")(quoting United States v. Lincoln, 630 F.2d 1313, 1319 (8th Cir. 1980)).  A trial court's discretion under Rule 33 "should be exercised sparingly."  Sanchez, 969 F.2d at 1414.

Defendants alleging government witness trial perjury in a Rule 33 motion must demonstrate that the witness' testimony was actually false and "that 'the jury probably would have acquitted in the absence of the false testimony.'"  United States v. Moore,

54 F.3d 92, 99 (2d Cir. 1995)(quoting Sanchez, 969 F.2d at 1413-14); United States v. White, 972 F.2d 16, 20 (2d Cir. 1992).  The Second Circuit has held that "in the rare instance where it can be shown that the prosecution knowingly used false testimony . . . we would apply a less stringent test and permit the granting of a new trial where the jury 'might' have acquitted absent the perjury."  Sanchez, 969 F.2d at 1414 (citing United States v. Stofsky, 527 F.2d 237, 246 (2d Cir. 1975)).

DISCUSSION

EVIDENCE AND OBSERVATIONS BEARING
ON ALL COUNTS OF CONVICTION

1.    Format of Decision

By way of format, a review of the evidence placed before the jury pertaining to Counts One, Two and Four is necessary not only for Rule 29(c) purposes, but also to place defendants' Rule 33 applications in context.

As to the Rule 33 applications, some of the grounds advanced relate to Counts One and Two and also Count Four.  Plus many of the multiple grounds significantly overlap.  Accordingly, rather than address the grounds seriatim under the captions assigned to those grounds by the particular movant, I will combine several of the points under an appropriate heading in an effort to avoid undue duplication while endeavoring to discuss all of Rule 33 arguments made.

2.   Defendants' Positions as to Counts One and Two

A common theme advanced by the defendants throughout the trial as to Counts One and Two is that neither harbored the requisite criminal intent to commit the crimes charged.  Indeed, both insisted at length during their testimony that they merely signed the implementing documents as presented to them by cooperating witness Nicholas Pellegrini ("Pellegrini") and his cohorts absent any realization that a fraud was afoot.

The jury was called upon to evaluate that theme in determining whether or not the government had met its burden of proof and, in doing so, presumably considered the backgrounds, education and business experience of defendants.  Indeed, Sofia's counsel appropriately asked the jury during his opening to consider her "background" including being raised in "a different culture" where "males are responsible for the financial health of the family" and "women are second class citizens."  (Tr. at 125.) Moreover, to the extent each defendant claims to have been victimized by Pellegrini, the relationship between Pellegrini and particularly Joseph Atias warrants mention.  Why?  Because such evidence is germane as to whether either defendant was simply a passive dupe in the fraudulent bank scheme claimed to be hatched by another as each maintains.

3.   Defendants' Positions as to Count Four

As to Count Four, defendants cite, among other things,

-9-

a lack of understanding as to the meaning of several pivotal questions on the Medicaid application and recertification forms, together with a shared belief that monies paid for such items as overseas travel and for various other personal expenses while on Medicaid were not reportable to the Department of Social Services ("DSS") as being allegedly funded by loans and gifts.

4.    Backgrounds of Sofia Atias and of Joseph Atias and an Overview of Joseph Atias's Business Experience

    (a)    Sofia's Background

        Sofia Atias is a middle aged woman who migrated to the United States from Israel in 1986.  (Tr. at 1520-21.)  She thereafter became a United States citizen, (id. at 1521), graduated from a Long Island high school and then attended college for one year.  (Id. at 1912-14.)

        She was primarily, if not exclusively a stay-at-home mother thereafter.  Five children were born as a result of her marriage to Jacques Amsellem.  (Tr. at 1526.)  Upon her marriage to Joseph in 2004, (id. at 1917), she became the stepmother to his two children, (id. at 1945), and, as a result of her union with Joseph, an 8th child was born.  (Id.)

        The previously noted prediction by counsel that the evidence would show Sofia was likely to readily comply with demands made by members of the opposite sex was called into serious question — or so the jury might have concluded — given the manner in which she fielded questions on both direct and

cross-examination during her extended time on the witness stand. During that give-and-take process, she displayed a forceful demeanor and strong intellect.

(b)  Joseph's Background

Joseph Atias, 53 years of age when he testified, was born in Israel and studied mechanical engineering in that country.  (Tr. at 2226.)  He also served in the military for a total of seven years, first on active duty and then as a member of the reserve.  (Id. at 2227.)  Upon immigrating to United States in the early to mid-1990s and becoming a citizen in the "[m]id'90s," he became involved in real estate transactions. (Id. at 2228-30.)  He, and apparently one or more associates, looked for undervalued properties. (Id. at 2230-31.)  The deals that closed were lucrative.  (Id. at 2231.)  One transaction he did with Pellegrini in the early 2000s resulted in each realizing a profit of $400,000.  (Id. at 926.)

Joseph also became a principal and operated several businesses including "New York Forex Fund" which originally started "as a foreign exchange trading logarithm" and which by 2007 had "a few hundred thousand dollars."[5]  (Tr. at 2260.)  Two other business he had were "Cryoshape Global" ("a company that was created to accommodate an exclusive marketing right for a

---

[5]  The "Theft of Governments Funds" charged in Count Four began in 2009.  (Superceding Indictment (Doc. # 140) at ¶ 29.)

medical device" developed by a friend of his who was a plastic surgeon in Israel) and "Incentives IQ" (dealing "with cyber security, internet security"). (Id. at 2261-62.)

Over time he apparently became viewed as a person of sufficient business and technological gravitis that (1) he "was invited with his close friend and superior officer during his military time in Israel to evaluate a technology in South Africa that was designed "help locate and identify missing and kidnaped soldiers." (Id. at 2287.) Also, while his family was on Medicaid, he traveled to Zurich "to evaluate software . . . for insurance companies" and to Geneva for another business purpose. (Id. at 2291-92.) Joseph testified that his associated transportation costs were borne by another, and he supposedly received no compensation for his involvement. (Id. at 2292.)

Among his other travels while on Medicaid were trips to Mumbai, India.[6] (Tr. at 2298-2300.) The reason for his trips was to help software developers with respect to a system that he designed. The beneficiaries of his input "were the programers that were actually writing the code for the system." (Id. at 2299.) The persons that he was interacting with towards that

---

[6] Information about Joseph's various overseas trips – some of which were taken while the family's application for Medicaid benefits was pending or while such benefits were being received — is provided not only as bearing on defendants' backgrounds but also as relevant as to Count Four which will be discussed in detail infra.

goal were not only in India but "also in the Phillippines and some in Russia." (Id. at 2300.)  To the coders that were helping to develop his program he wired "anywhere from 150 to 200,000 dollars," (id.), again while collecting Medicaid.

The jury heard all of the above information plus much more, detailing Joseph's educational and extensive experience in the business community.  Given his background, possibly the jury had significant reservations about his credibility vis-a-vis the counts of convictions concerning such matters as, inter alia, his professed inability to understand the term "self employment" in the Medicaid application form, (Tr. at 2545-46), and his purported failure to review, cursorily or otherwise, most, if not all of documents underlying the Counts One, Two and Four. Perhaps such a cavalier attitude as to such important matters seemed out-of-sync with the probing, accomplished person he seems to be.

Similarly the jury may have questioned the notion that Sofia is a subservient second class citizen as suggested during her opening after listening to her for several days on the stand and learning of her thirty plus years as a United States resident and citizen.

5.    Evidence and Information Bearing
      Particularly on Counts One and Two

      (a)   Pellegrini's Background and Relationship With
            Sofia and Joseph; Pamela Lee's and Pellegrini's
            Involvement in Subject Short Sale

      The jury was provided with more than ample information

-13-

with which to evaluate Pellegrini's credibility.  They learned, for example: (1) that he was no longer permitted to practice law in the State of New York, having been suspended in 2012, (Tr. at 911), (2) that he pled guilty to Count Two of the captioned indictment and is presently awaiting sentence, (id. at 912), (3) that he has pending charges in a "state court in Suffolk County" pertaining to alleged illegal acts committed by him in his capacity as a lawyer, (id. at 881),[7] (4) that he either personally or through an intermediary forged a number of real estate documents and on more than one occasion notarize signatures thereby affirming that the signatures were affixed in his presence when such was not the case.  (Id. at 1052 and 1055-58.

Defense counsel argue that Pellegrini is the villain underlying the scenario set forth in Counts One and Two.  Clearly he was in the midst of the wrongdoing.  But to suggest that he was the instigating and primary wrongdoer with defendants merely his victims, is nigh impossible to square with the evidence.  As to the relationship between the Atiases and Pellegrini the jury learned (1) defendants purchased 83 Cathedral Avenue from Pellegrini, (Tr. at 928), who had previously used the building as

---

[7]  Pellegrini, after being advised of his right not to testify concerning the pending charges in the state court elected to waive his right and testified about those items before the jury.  (Tr. at 884-889.)

his home and office, (id. at 866), (2) Joseph and Pellegrini did numerous real estate transactions together over many years; notably Joseph's role typically was to find the investment properties and put together the transactions via negotiating with the sellers, with Pellegrini's role being to arrange the financing and do the associated legal work (id. at 924-25), and (3) most importantly, as to the short sale and subsequent non-arms length transfer of 83 Cathedral Avenue to Sacred Heart Academy as charged in Counts One and Two, overwhelming evidence was presented by the government indicating that the idea for that fraud did not originate with Pellegrini but instead was the brainchild of Joseph.  Indeed, prior to Pellegrini becoming involved in the subject transaction, Joseph contacted a short sale specialist recommended by an individual in Sofia's brother's office, Pamela Lee ("Lee").  (Id. at 2344 and 2358.)

Lee testified that Joseph contacted her in July of 2011.  (Tr. at 3073.)  He expressed an interest in the rules pertaining to a "flip" i.e. whereby a short sale is followed by the purchaser at the short sale selling to a third party.[8]  (Id. at 3076-77.)  She later met Joseph in person and "gave him a very detailed outline" of the process together with samples of the "documents . . . to submit to the bank."  (Id. at 3078.)

---

[8]  Joseph's interest in short sales pertained to two properties in Nassau County, one being the subject property at 83 Cathedral Avenue.  (Tr. at 3074.)

Included within that package was a specific "hardship letter" pertaining to 83 Cathedral Avenue for Sofia's signature and submission to the mortgagee bank, together with a proposed "contract of sale" for the property.[9]  (Id. at 3080.)

After Joseph and Sofia decided to replace Lee with Pellegrini as their lawyer, Pellegrini called Lee to "discuss[] the transaction."  (Tr. at 933.)  He thereafter "g[o]t some paperwork from her" through Joseph.  (Id.)

As Joseph explained to defense witness Charles Strain ("Strain"), selling directly to an interested party, such as Sacred Heart Academy, would not be a "smart" thing to do.  (Tr. at 2709.)  By using an intermediary, Joseph and Sofia would receive the "spread" consistent with their stated goal.  (Id. at 1742-43.)

In sum, while the jury was aware of Pellegrini's significant criminal role in the charged fraud they also heard testimony that the origin of the idea was traceable to Joseph with Pellegrini serving primarily as the technician to implement that scheme.  Thus the notion that "[a]bsent the testimony of Pellegrini . . . , the evidence is unequivocal that the defendants were unaware of the fraudulent nature of the short

---

[9]  Incidentally, Lee testified that Joseph did not tell her that "Sacred Heart Academy . . . was willing to pay more than the outstanding mortgage," or that the intended short sale would not be an arms-length transaction.  (Id. at 3088.)

sale" is dubious given the overwhelming evidence to the contrary. (Defs.' Apr. 6, 2017 Letter in Supp. (Doc. # 239) at 3.)

  (b)  Information About the Documents Used to
       Accomplish the Short Sale Itself, the
       Subsequent Sale to Sacred Heart Academy,
       and Disposition of the Proceeds

Using a format provided by Lee, Sofia sent a letter to the mortgage bank indicating that they were unable to meet their payment obligations. (Id. at 3090-91.) She neglected to note that Sacred Heart Academy was interested in buying the property at an amount that would have more than satisfied their obligation.

Pellegrini, rather than forming a new corporation to acquire the property at the planned short sale – with the time and money that process would have entailed – told the Atiases that they could use an existing non-functioning corporation of his, Jefferson Management Property Corp. (Tr. at 935.) After some negotiations, the bank agreed to a short sale to that corporation for $485,000. With the bank's approval of a short sale for $485,000 and the Sacred Heart Academy's offer both being in place, (id. at 916-17), "the house was sold [by] Sofia Atias . . . to a newly formed corporation [viz. Jefferson Real Property Management Inc.] for the purpose of this transaction." (Id. at 917.) Pursuant to the plan, "two months later, more or less, the new corporation sold the house to Sacred Heart for $925,000. So the difference, which is about $400,000, went to the Atiases."

-17-

(Id.)

The spread realized from the second sale was then deposited in the MC-12 Trust at the direction of Joseph.  (Tr. at 1006.)[10]  The reason for that, according to Sofia, was that the $400,000 plus monies represented the return on $100,000 that the Trust had loaned to the short sale purchaser several months earlier which was applied towards the $485,000 short sale purchase price.  (Id. at 2071-73.)

SUFFICIENCY OF EVIDENCE AS TO
COUNTS ONE & TWO UNDER RULE 29(C)

In sum, the evidence as to Counts One and Two as to each defendant was more than sufficient to support the jury's verdict.  Accordingly, their respective Rule 29(c) motions are denied. Also denied are defendants' Rule 29 motions made prior to the case being submitted to the jury.

Attention will now be directed to defendants' applications for judgments of acquittal with respect to Count Four.

---

[10]  The MC-12 Trust was established by Sofia's mother and partially or totally funded by the above "spread" mentioned in the text, plus $210,000 that Sofia inherited following her father's death.  The two trustees are Sofia and her then teenage daughter, Rachel Amsellem.  Rachel Amsellem also was an authorized signatory for Jefferson Real Property Management, Inc. and, as such, signed the deed transferring the property to Sacred Heart Academy.

SUFFICIENCY OF EVIDENCE AS TO
COUNT FOUR[11] UNDER RULE 29(C)

Count Four, entitled "Theft of Government Funds"

alleges

> [O]n or about and between February 1, 2009
> and February 28, 2015, both dates being
> approximate and inclusive, within the Eastern
> District of New York, the defendants SOFIA
> ATIAS and JOSEPH ATIAS, together with others,
> did knowingly and intentionally steal,
> purloin and convert to their own use and the
> use of another, money and things of value in
> excess of the sum of $1,000 of the United
> States and a department and agency thereof,
> to wit: the United States Department of
> Health and Human Services Medicaid Program
> for Medicaid Benefits, which is administered
> by the Nassau County Department of Social
> Services.

(Superseding Indictment (Doc. # 140) at ¶ 29.)

From on or about February 1, 2009 until February 28,

2015 the Atiases have received over $200,000 in Medicaid

benefits.  (Tr. at 2614-15.)  The government has provided an

accurate overview of the testimony placed before the jury

indicating that the subject sums were stolen from "the United

States and a department or agency thereof" via the fraudulent

---

[11]  Count Three charged defendants with submitting a
fraudulent loan application to Bank of America in which it is
alleged that Sofia Atias indicated that she was an employee of
IncentiveIQ, Inc. and had been for three years prior to the
application with an income from that source of $23,500 a month.
At trial, it was essentially uncontroverted that she was not
employed by any entity at the time the application was submitted,
or any time within three years prior thereto.  In any event, both
defendants were acquitted of this charge.

manner in which Sofia, with her husband's complicity, completed the Medicaid eligibility and recertification forms provided to the Nassau County Department of Social Services.  The Government's on-target synopsis is hereby incorporated by reference.  (Gov't's Apr. 21, 2017 Opp. (Doc. # 241) at 2-5.) What follows in this section of the decision are some of my additional observations as the trial judge.

To the extent defendants told the jury that they did not understand portions of the Medicaid application forms (see Gov't's Ex. 30), the jury may had difficulty accepting  that testimony given the defendants' backgrounds and the clear language involved.  (See the following items in Gov't's Ex. 30, NOTIFICATION OF CLIENT RESPONSIBILITY dated Nov. 6, 2008 (00003099), and the "Resource Worksheet.")  On the worksheet, (00003100) Sofia indicated the only resource on hand was $100 in a checking account.  On the "Declaration of No Income" portion of the application (00003101) Sofia indicates that her "husband is not working and we have no income.  We live basically upon my child support and my mom helps us as well."  That same representation is carried forward in the recertification process which occurs yearly thereafter  even though it is undisputed that Joseph was working at various times, if not during the entire time the family received Medicaid.  As to the fact that the "self employment" box was never checked in the application or

recertification process, Joseph Atias testified that he did not understand what the term "self employment" means. (Tr. at 2545-46.)  Again, given his background, the jury may have found that declaration to be untrue.

As government witness Heather Griffin ("Griffin") from DDS  explained, the purpose of listing "Additional Resources Not Listed Above" on the "Resource Worksheet" (00003100) is to permit DSS to determine whether such resources are available for support purposes.  (Tr. at 402-04.)  That rationale applies to the numerous personal expenses of the Atiases which were paid while they were on Medicaid through Joseph's various business, such as tuition payments for one of their children's schooling, (id. at 1825,1832), and child support payments to Joseph's former wife. (Id. at 2547.)  In any event, one of the themes espoused by defendants was that to the extent business credit cards were utilized for personal expenses, — as they admittedly were – the sums involved were loans from the corporations involved and therefore not reportable.  Even if, arguendo, that testimony was truthful notwithstanding the lack of supporting documentation, the sums involved were required to be reported to DSS so that they could conduct the requisite investigation.

Also unreported to DSS was Sofia's inheritance of over $200,000 following the death of her father as well as the over $400,000 spread the Atiases realized from the sale of 83

-21-

Cathedral Avenue to the Sacred Heart Academy.  Those sums, as previously noted, ended up as part of the corpus of the MC-12 Trust.  And, as correctly noted by the government, that Trust, in turn, funneled monies to Joseph's businesses including payments in March of 2012 "of $10,000, $5,000 and $18,000 and, in December of 2012, the business account received payments totaling $42,000."  (Gov't's Apr. 21, 2017 Opp. (Doc. # 241) at 4 (with citations to the record).)  Joseph and Sofia typically maintained, again absent supporting proof, that all such transactions were loans subject to obligations of repayment.

Defendants' claim that monies received were loans, i.e. not income reportable to DSS, is not available to them with respect to government's exhibit 71.  That exhibit is Joseph's affidavit filed in support of his motion to dismiss plaintiff's claims in Michael Knopf and Leonard Wisneski, MD v. Joseph Atias, Index No. 7887-2011 then pending in the Supreme Court of Nassau County.  In paragraph 12 of that submission, Joseph averred: "Mr. Knopf's claim for conversion must be dismissed because he gave me his credit card to use for my personal expenses, which I did for about $50,000 . . . ."  (Ex. 71 (Feb. 8, 2012 Aff.) at ¶ 12.) The $50,000 was "part of Mr. Knopf's payment to me of $350,000 for my obtaining the distribution rights for the Etgar deal in February 2010, Mr. Knopf gave me his American Express credit card and told me to use it to pay for my personal expenses."  (Id. at

¶ 13.)  In paragraph 16, Joseph informs the Nassau County Supreme Court Justice that "Mr. Knopf, in his own handwriting, acknowledged his remaining $300,000 obligation to me (after payment of about $50,000 by use of his credit card). . . ."  (<u>Id.</u> at ¶ 16.)

Clearly the use of the just referenced credit card to the tune of $50,000 was income, at least according to Joseph's affidavit, just as the additional $300,000 claim was a "resource."  Neither, of course, was reported to DSS.  The jury may have concluded, legitimately so, that the Atiases' wholly uncorroborated testimony concerning numerous other personal expenses paid through Joseph's many businesses constituted reportable income, not loans, and that both defendants knew such to be the case.

The jury also learned that the Atiases vacationed in such resorts as Cancun and Punta Cana while reporting de minimus assets to DSS.  To the obvious question as to where the money came from for those trips, the answer given was that each was funded by a gift from Sofia's mother.  Tellingly, however, no corroborative evidence was provided by way of testimony from the living benefactor, (Tr. at 3337-38), or otherwise.

The defense called Moriah Adamo ("Adamo") – who after acknowledging that defendants never advised her that Joseph had access to, and in fact used the just discussed credit card of

Knopf for personal purchases of $50,000, (Tr. at 3011), or about the $10,000 that the Atias' received from a charity while they were on medicaid to pay for their rent, (id. at 3013-14) — explained that a number of the resources seemingly available to the Atiases may or may not have constituted available resources for purposes of DSS depending upon further analysis. The jury, however, may have accepted the testimony given by government witness Griffin that unless the medicaid applicant reports the existence of such items, there is nothing to trigger a possibly disqualifying follow-up investigation. That defendants knew this is evidenced by the events surrounding their 2009 application to receive "Home Energy Assistance" benefits. Upon being asked to complete a self employment work sheet requesting "personal and business . . . bank statements" and other financial records the Atiases elected to abandon "the whole process" by "manag[ing] with the family to help [them]." (Id. at 2116-19.)

Finally, as to the sufficiency of the proof regarding Count Four, defendants also maintain that the evidence did not demonstrate that "defendants stole the funds" under "18 U.S.C. § 641," (Sofia's June 2, 2017 Reply (Doc. # 253) at 2), or that the amount involved exceeded $1,000.00 as charged in the indictment. Indeed, Joseph takes the position that "nothing [was] stolen," maintaining that even if, arguendo, fraud and concealment with resulting loss was established such conduct falls outside the

-24-

scope of section 641. (See Joseph's Dec. 1, 2017 Sur-surreply (Doc. # 281) at 3 ("And the government attorney [in his October 13, 2017 surreply] once again obscures that its investigators, even if they uncovered concealment and fraud, failed to uncover theft.")(emphasis in original).)

The "theft-fraud distinction" Joseph seeks to draw is a defense afterthought. I don't recall it ever being expressed during the government's presentation of "concealment" and "fraud" evidence with respect to Count Four. Moreover, although the subject distinction is absent from the Court's charge in both language and substance (Tr. at 3487-91), the relevant part of the instruction was given to the jury essentially on consent. (See id. at 3195-3229 (setting forth the charge conference).)

But the absence of a relevant objection being made during the taking of evidence, and during the charge conference, would not be dispositive of the issue if Joseph's theft fraud distinction is valid. Such, however, is not the case. The second element of the Court's charge as to Section 641 under Count Four was modeled after Instruction 23A-4 in 1 Leonard B. Sand, et al. Model Federal Criminal Jury Instructions at p. 23A-11 (2017). That element, i.e., the second element, is entitled "Defendants Stole or Embezzled" Property under Section 641. A juxtapositioning of the language of Section 641 with applicable case law indicates the correctness of the Sand's instruction, and

-25-

in the process, the invalidity of Joseph's.  Rather than "reinvent the wheel," the reader is referred to the "Comment" section to the aforementioned instruction and cases cited therein, including United States v. Oliver, 238 F.3d 471, 472–73 (3d Cir. 2001)("A violation of § 641 may be established if defendant embezzles, steals, purloins, or knowingly converts to his use government property. 18 U.S.C. § 641. After reviewing the record and the parties' brief, we are convinced that the jury had substantial evidence to conclude that Oliver stole property of the Government by intentionally deceiving it about his continued employment as a registered nurse during the period of time he received disability benefits.").

In sum, the evidence of guilt as to each defendant under Count Four, particularly when viewed through the differential prism embodied in Rule 29(c), is overwhelming. Accordingly, defendants' motions for a judgment of acquittal as to the "theft of Government Funds" charge are denied as are their Rule 29 motions made during the trial seeking the same relief.

### DEFENDANTS' RULE 33 MOTIONS FOR A NEW TRIAL AS TO EACH OF THE COUNTS OF CONVICTION

By way of format, the Court will address each of the numerous grounds advanced by defendants, beginning with their claim that "Pellegrini's testimony was so patently incredible that no rational jury could believe it." (Defs.' Apr. 6, 2017 Letter in Supp. (Doc. # 239) at 1.)  As explained earlier,

however, some of the grounds will be grouped given their overlap and discussed under different headings than those used by movants to lessen duplication.

1. Pellegrini's Testimony

The claim that Pellegrini's testimony should be rejected in toto as a matter of law is belied by a review of the record. For instance, his testimony concerning the information he received from Lee dovetailed with that of Joseph. It is undisputed that the idea of using an intermediate corporation for the flip sale originated with Lee and was thereafter relayed by Joseph to Pellegrini. (See both Pellegrini's testimony, Tr. at 933 and 1009, and Joseph's testimony indicating the same, id. at 2355-58.) Similarly the advice that Pellegrini provided to the Atiases concerning the need for the buyer of the property at the short sale to be someone they could trust and would be loyal to their interests eventually manifested itself in Sofia's 19 year old daughter becoming the signatory who would transfer title to the 83 Cathedral Avenue property to Sacred Heart Academy in March of 2012. (Id. at 1010-11.)

Defendants have failed to specifically explain the reasons underlying their conclusion that his testimony was patently incredible. Simply arguing, as they do, that Pellegrini, in defendants' judgment, purportedly minimized his involvement in unrelated other short sales does not make it so

nor invalidate what he told the jury about his interaction with defendants vis-a-vis Counts One and Two.  And again, as noted earlier, the apparent lynchpin for defendants' claim, viz. that "[a]bsent the testimony of Pellegrini . . . the evidence is unequivocal that defendants were unaware of the fraudulent nature of the short sale," is simply irreconcilable with the major thrust of the evidence adduced at trial.  (Defs.' Apr. 6, 2017 Letter in Supp. (Doc. # 239) at 3.)  In sum, this first Rule 33 ground advanced by the defense in the April 6, 2017 letter is without merit.

2.  <u>Conscience Avoidance Charge</u>

The defense does not challenge the language embodied in the Court's conscience avoidance charge but rather the fact that it was given.

As explained in the June 2, 2017 supplemental submission made on behalf of Sofia "the Second Circuit has held that a factual predicate for a conscience avoidance charge 'may be establish where a defendant's involvement in the criminal offense may have been so <u>overwhelmingly suspicious</u> that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge,'" <u>citing</u> <u>United States v. Lange</u>, 834 F.3d 58, 78 (2nd Cir. 2016).  (Sofia's June 2, 2017 Reply (Doc. # 253) at 14.) The operative phrase in the above excerpt from <u>Lange</u> is

-28-

"overwhelmingly suspicious" as indicated by its underscoring in the June 2nd reply.

The conduct of each of the defendants as to counts of conviction readily satisfied the standard of "overwhelming suspicious."  As to Counts One and Two, the scenario as it unfolded during the trial whereby the Atiases: (1) owed approximately $800,000 to the mortgagee bank; (2) had an offer for the subject property which exceeded the amount of that indebtedness by roughly $125,000, (3) convinced the bank — which was unaware of the offer — to approve a non-arms length short sale for $485,000 with a concomitant forgiveness of the remaining indebtedness consistent with Sofia's hardship letter; and (4) in effect, pocketed the spread was, from the Atiases' perspective, simply "to good to be true," i.e. "overwhelming suspicious."

With respect to Count Four, as earlier explained, Joseph operated numerous businesses while on Medicaid, none of which were disclosed to DSS.  Funds from those businesses were used by Joseph and Sofia to pay for a multitude of personal expenses for such items as, e.g. his child support and for private school tuition.  Moreover, monies materialized for both personal and business trips abroad while defendants falsely reported a lack of employment and virtually no assets.

Granted, defendants offered explanations for such seeming financial anomalies citing uncorroborated gifts and

loans, coupled with the representations that neither read any of the short sale or DSS forms involved and, in some instances, actually completed.  Given the jury's verdict, it appears those explanations were found to be bogus.  Simply put, an adequate foundation existed for the conscious avoidance charge being given.

3.    Zarate's Invocation of Fifth
       Amendment Privilege

        Defendants endeavored to call Carlos Roa Zarate ("Zarate") as a defense witness.  Their purpose was to "introduc[e] substantial impeachment evidence of the credibility of Pellegrini, the only witness to establish [defendants'] knowledge and intent to defraud."  (Id. at 9.)

        Zarate appeared in Court with his personal attorney, Gerald DiChara, Esq.  The Court learned that Zarate was prepared to testify concerning the short sale of the Atiases' home at 83 Cathedral Avenue either for the government or the defense.  It was further explained, however, that he would invoke his Fifth Amendment privilege to the extent he was asked about other criminal activities such as his involvement with other fraudulent short sales with Pellegrini.  The invocation of the privilege was based on the position that the immunity he was granted by the federal government and by the Suffolk County District Attorney's Office was not sufficiently broad to insulate him from prosecution for other and independent crimes he may have

committed with Pellegrini.  It was my view then, as it is now, that both the federal and state immunity agreements are so narrowly drawn that the line of inquiry sought to be pursued by defendants would trigger the proper invocation of Zarate's right against self incrimination.

Paragraph 2(a) of agreement between Zarate and the government provides that:

> no criminal charges will be brought against the Witness for his heretofore disclosed participation in criminal activity involving bank fraud and conspiracy to commit bank fraud, all from the period 2011 through 2012 in connection with the sale of real property at 83 Cathedral Avenue, Hempstead, New York.

(See Gov't's Mar. 9, 2017 Letter (Doc. # 204) at 3 (quoting from Gov't's Ex. 3500 CZ 11 at 2).)

The corresponding provision in Zarate's cooperation agreement with the County of Suffolk limits its scope of immunity to:

> Any and all charges relating to the criminal transaction set forth in SUPERIOR COURT INFORMATION pending in the County Court of Suffolk County charging CARLOS ROA-ZARATE with one count of Grand Larceny in the Third Degree and one count of Falsifying Business Records in the First Degree in violation of New York State Penal Law sections 155.35 and 175.10.

(Gov't's Ex. 3500 CZ 3 (Doc. # 207-1.)

The suggestion is made that the Court failed to consider paragraph 2(b) of the federal agreement in analyzing the

-31-

protection afforded to Zarate under his June 8, 2016 agreement with the government.  (Joseph's July 17, 2017 Reply (Doc. # 256) at 10.)  Paragraph 2(b) reads in pertinent part "[N]o statement made by the witness during the course of this cooperation will be used against him . . . ."  (Gov't's Ex. 3500 CZ 11.)

"Pre-trial agreements, such as cooperation agreements and proffer agreements, are interpreted according to principles of contract law." United States v. Liranzo, 944 F.2d 73, 77 (2d Cir. 1991).  A fair reading of paragraph 2(b) explains that no statement made by Zarate will be used by the government as evidence against him in any subsequent prosecution.  It does not say nor imply that Zarate would henceforth be wholly immune from prosecution, not only as to 83 Cathedral, but also for any other wrongdoing mentioned during their meeting.  If the latter had been their intention, it would have been simple to so state. Simply put, Zarate was not granted transactional immunity for anything other than the short sale of 83 Cathedral Avenue and, as a result, he remained subject to prosecution — notwithstanding paragraph 2(b) and defendants' arguments to the contrary — if evidence of such other wrongdoing comes from a legitimate independent source.  See generally, United States v. Quatermain, 613 F.3d 38, 40 (2d Cir. 1980); McCormick on Evidence § 143 (7th Ed. 2016 Pocket Part).

4.   Applicability of Federal Rule of
     Evidence 608(b), Assuming, Arguendo,
     Zarate did not Properly Invoke his
     Fifth Amendment Privilege

The defense sought to elicit from Zarate that
Pellegrini's testimony as to the breadth of his fraudulent short
sale activities was more extensive than he indicated.  The
intended purpose of that exercise was to further and
"substantially impeach[] Pellegrini's credibility by specifically
refuting many of Pellegrini's denials of his participation in
other short sales."  (Sofia's June 2, 2017 Reply (Doc. # 253) at
9.)

As framed, defendants' proffer appears to be violative
of Rule 608(b)'s admonition that "[e]xcept for a criminal
conviction under Rule 609, extrinsic evidence is not admissible
to prove specific instances of a witness' conduct in order to
attack or support the witnesses character for truthfulness."
Fed. R. of Evid. 608(b).

It may well be, however, that the reason for wanting to
call Zarate extended beyond an assault on Pellegrini's general
"character for truthfulness."  For example, was Pellegrini's
testimony colored, to defendants' detriment, in an effort to
downplay his criminality since he was, and still is, awaiting
sentence which will be imposed by me?  If so, 608(b)'s "extrinsic
evidence" bar arguably would not preclude the intended line of
inquiry.  For that reason, the Court declines to rely on that

-33-

Rule to resolve the question of whether the defense was improperly prevented from calling Zarate as a witness for the purpose stated.

5.    Prescinding From Zarate's Proper
      Invocation of his Fifth Amendment
      Privilege, Zarate's Testimony Would
      Have Been Cumulative

       Under Federal Rule of Evidence 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . needlessly presenting cumulative evidence."

       As previously noted, the jury was furnished with abundant information indicating that Pellegrini ignores established legal and ethical standards when it serves his purpose, so much so that he is prohibited from practicing law. Moreover, they were instructed to evaluate his testimony with caution.  (Tr. at 3448 and 3450.)

       Having Zarate take the stand to contradict Pellegrini — not with respect to Pellegrini's testimony regarding 83 Cathedral Avenue, but on other possible fraudulent short sales — seemed to me to be appropriately precluded under Rule 403 as unnecessarily cumulative.  And, of course, what Zarate might have said would not necessarily be synonymous with the reality of the situation, thereby raising the specter of a series of needless peripheral disputes being litigated resulting in "wasting time" and "undue delay."  Fed. R. of Evid. 403.

-34-

6.    Requested Order Directing Government
      to Immunize Zarate

          The argument is advanced by Joseph that, given the

Court's fifth amendment ruling, it should have compelled the

prosecution to immunize Zarate.

          "Absent exceptional circumstances," the government is

not required to grant immunity to a defense witness who has

invoked his fifth amendment right not to testify.  Blisset v.

Lefevre, 924 F.2d 434, 441 ((2d Cir. 1991).  As the Court stated

in United States v. Bahadar:

          [W]e have repeatedly held [that] the fifth
          amendment does not require that defense
          witness immunity must be ordered whenever it
          seems fair to grant it.  We have recently
          reaffirmed the longstanding principle that
          [i]mmunity remains preeminently a function of
          the Executive Branch.  The statute which
          confers the power to grant immunity in court
          and grand jury proceedings, 18 U.S.C. §
          6003(a), gives the district courts the power
          to issue orders requiring individuals to give
          testimony only upon the request of the United
          States attorney for such district.

954 F.2d 821, 825 (2d Cir. 1992)(citations and internal quotation

marks omitted).

The Second Circuit has identified

          a three-part test for requiring the
          government to grant defense witness immunity
          at the risk of dismissal of the indictment.
          First, the district court must find that the
          government has engaged in discriminatory use
          of immunity to gain a tactical advantage or,
          through its own overreaching, has forced the
          witness to invoke the fifth amendment.
          Second, the witness's testimony must be

> "material, exculpatory, and not cumulative."
> Third, the testimony must be unobtainable
> from any other source.

Id. at 826.

Instances in which all three parts of the conjunctive test have been satisfactorily demonstrated are few. Cf. United States v. Ferguson, 676 F.3d 260, 291 (2d Cir. 2011)("[I]n the nearly thirty years since establishing a test for when immunity must be granted, we have yet to reverse a failure to immunize.")

Measured against the three part test articulated in Bahadar, defendants' application comes up short. As to the first part or element, no evidence has been adduced to show that the government either declined to grant immunity to Zarate to obtain a tactual advantage or somehow induced Zarate to invoke the fifth amendment. As to the second element, the witness's testimony would be of marginal materiality and clearly cumulative. As earlier indicated, no less a source than defendant Joseph explained to the jury that he and Lee came up with the short sale scenario utilized by defendants to defraud the mortgagee bank; Pellegrini was essentially the tactician that implemented that scheme. And Pellegrini was examined at length by defense counsel. The jury is well aware, again, that he, inter alia, pled guilty to the crimes charged in Counts One and Two, that he is no longer permitted to practice law because of his criminal and unethical conduct and that he currently has criminal state charges pending. Possible evidence of additional unrelated

fraudulent short sales involving Pellegrini — had Zarate been available to testify — would have been cumulative under the circumstances as to the jury's task of evaluating Pellegrini's truthfulness and his testimony about 83 Cathedral Avenue.

As to the last of the three elements, i.e. information unavailable from another source, defendants have not showed, e.g. that "other partners in Mr. Roa-Zarate's business" could not have been subpoenaed to testify about the extent of Pellegrini's fraudulent short sale activities.  (Gov't's Mar. 13, 2017 Letter (Doc. # 207) at 3.)  In sum, defendant has not mounted a convincing argument that the Court should have overridden the executive branch's decision not to immunize Zarate by directing it do so.

7.    Missing Witness Charge

Finally with respect to Zarate, the defense urges that a missing witness charge should have been given to the jury.  For that charge to issue the proponent must show, among other things, that the witness sought to be produced "'is perculiarly within the power' of the other party."  United v. Nicholas, 912 F.2d 598, 601 (2d Cir. 1990)(quoting United States v. Torres, 845 F.2d 1165, 1169 (2d Cir. 1988)).  No such showing has been made here.

Zarate was in the courtroom with his attorney and the Court was advised that Zarate was willing to take the stand and testify concerning his knowledge about the transaction upon which

Counts One and Two are based at the beckoning of the government or defense. So, rather than being particularly within the power of the government, he was available to all parties. But defendants had no intention of asking Zarate about 83 Cathedral Avenue and about their supposed victimization by Pellegrini. Their goal was to explore other short sale frauds contemplated or committed by Pellegrini. As noted, however, such information would have been unnecessarily cumulative. And, parenthetically, the notion Zarate's testimony would have supported defendants' contention that Pellegrini and his colleagues concealed the fraud from defendants is doubtful in that the gravamen of scheme — as repeatedly noted earlier in discussing other parts of defendants' motions — originated with Joseph based, in part, on information provided by Lee. (See Sofia's June 2, 2017 Reply (Doc. # 253) at 11.)[12]

    For the reasons indicated, the Court declined to provide a missing witness charge and I am not convinced based on the current submission, though well crafted, that my decision was

---

[12] Indeed, that Zarate's testimony might well have had the opposite effect is suggested by the FBI's notes of Zarate's interview. (Ex. 5 to Sofia's June 2, 2017 Reply (Doc. # 253).) For example, according to those notes "Zarate discussed with Pellegrini, while on the telephone with Joseph Atias (JAtias) that he wanted his commission to be two points since he knew Pellegrini was sell the [Cathedral Ave.] property to himself. JAtias resisted and states 'I have 8 kids to feed,' Zarate replied 'I have three girls to feed.' JAtias relented and agreed to Zarate's demands.") (Id. at p. 4 (capitalization of proper names omitted).)

flawed.

8.    Court's Rulings During Cross-Examination
      of Pellegrini Regarding his Sister-in-Law's
      Automobile Accident

          Defense counsel in their joint initial submission urge,

as one of the grounds for seeking a new trial, the following:

          [T]he Court improperly curtailed Pellegrini's
          cross-examination by precluding leading
          questions of Sofia Atias by the co-
          defendant's attorney and curtailing
          Pellegrini's cross-examination regarding a
          perpetrated vehicle insurance and
          identification fraud, matters certainly . . .
          relevant to Pellegrini's credibility.

(Defs.' Apr. 6, 2007 Letter in Supp. (Doc. # 239) at 2.)

          Precisely what is meant to be conveyed by the first

part of the above sentence is non-decipherable and, accordingly,

I am unable to fashion a response.  The second part of the

sentence, however, is intelligible and pertains to the cross-

examination by Sofia's attorney of Pellegrini.  The subject being

pursued arose out of an automobile accident Pellegrini's sister-

in-law, Carol Cendroski ("Cendroski") had in 2005 when the car

she was driving hit a parked car.  Upon learning of the incident,

Pellegrini responded to the scene and remained until the police

arrived.  By then, Cendroski had left.  Pellegrini learned from

the police that Cendroski — whom he knew was not a licensed

driver — had furnished his wife's license by way of identifying

herself to the officer.  Nothing was proffered to suggest that

Pellegrini played any part in the subject deception by way of

-39-

advising Cendroski or making false statements to law enforcement. Instead his purported transgression, apparently presented under Rule 608(b), was not volunteering information which would have served to untangle the misinformation provided by Cendroski. Whether his simple silence under the circumstances was sufficiently "probative of [Pellegrini's] character for truthfulness" to warrant the line of inquiry from being further pursued is, at best, problematic. Fed. R. of Evid. 608(b). And, given the abundant information already before the jury bearing on Pellegrini's credibility, viewed in conjunction with the Court's role as delineated in Federal Rules of Evidence 403 and 611(a)(1) and (2), I find the captioned ground for seeking a new trial unconvincing.[13]

9.   <u>Conduct of Prosecutors</u>

   (a) Failure to Correct False Testimony by
       Strain and Pellegrini and Associated
       <u>Shortcomings</u>

       Strain was called as a defense witness by Joseph.  He explained to the jury that he was a lawyer with "Farrell Fritz [, which] has served as the general counsel for Sacred Heart [Academy] since . . . 2002 or 2003."  (Tr. at 1324.)  Sometime in 2011, a letter was delivered to "owners or occupants of 83 Cathedral Avenue" setting forth Sacred Heart Academy's interest

---

[13]   The portion of the transcript relevant to the above discussion extends from page 1140 to page 1151.

in acquiring the property.  (Id. at 1327-28.)  Thereafter,

negotiations occurred between Joseph, representing his and

Sofia's interests, and Strain as the attorney for the prospective

purchaser.  During one such conversations — which was recorded by

Joseph and played to the jury — the following exchanges occurred:

>  Strain: Yeah, and when you do the deal with
>  the bank [short sale], is it that you're
>  buying them out, or is it, do you have a
>  third party do it? How does it work?
>  Atias: I can do — what I've done is a
>  corporation.
>
>  Strain: Okay.
>
>  Atias: So a corporation is buying it.
>
>  Strain: Right.
>
>  Atias: And so, we can —
>
>  Strain: And do they [the bank] know that that
>  corporation is related to you, they don't
>  care, or that's the part of the process that
>  — —?
>
>  Atias: That they don't care.  They know there
>  is a buyer.
>
>  Strain: Right, okay.
>
>  Atias: Yeah. And they know that there is a
>  buyer.  The buyer is, you know —
>
>  Strain: Is the corporation, and when the
>  corporation buys it, do you then have to wait
>  . . .

(Sofia's June 2, 2017 Reply (Doc. # 253) at 18-19 citing "pages

3-4 of Defs.' Exhibit 5, annexed to [the Reply papers] as Ex. 8"

(emphasis in original).)

     The defense maintains that a juxtapositioning of the

above excerpt from the taped conversation between Joseph and

Strain, with the following line of inquiry pursued by the

prosecutor in questioning Strain, signifies that the government

joined Strain in presenting "perjured testimony to the jury":

      Question: Did Joseph Atias ever tell you that the company
                selling the property at 83 Cathedral Avenue was
                owned by his brother-in-law?

      Strain:  He did not.

      Question: Did Sofia Atias ever tell you that the company was
                owned by a relative of hers.

      Strain:  No, she did not.

      Question: Did anyone ever inform you that the special
                purpose company corporation that was created to
                buy 83 Cathedral Avenue was owned by relatives of
                Sofia and Joseph Atias?

      Strain:  No.

(Tr. at 1447.)

Later, the government asked,

      Question: [w]ould it be fair to say knowing what you know
                now, substantial facts that were known to Joseph
                Atias were not communicated to you?

      Strain:  They were not communicated to us.

(Sofia's June 2, 2017 Reply (Doc. # 253) at 17 (citing Tr. at

1450).)

        And, it is urged, that government compounded the

supposed wrongdoing during its summation by arguing that:

        [b]ut what did Joseph Atias not tell Charlie
        Strain?  He didn't tell him, and this is the
        important part, of the tapes, not what the
        tapes show, it's what they don't show.  What

-42-

is committed intentionally by Joseph Atias. He never told Charlie Strain that the sale approved by Bank of America was a sale from his wife to a corporation in which his stepdaughter was the signator or his mother-in-law was funding the purchase.

(Id. at 18 (citing Tr. at 3269).)

"A witness commits perjury when he gives false testimony, as distinguished from incorrect testimony resulting from confusion, mistake or faulty memory." United States v. Bout, 144 F. Supp. 3d 477, 484 (S.D.N.Y. 2015)(internal quotation marks and citations deleted).  Labeling Strain's testimony as false to the extent of being perjurious, and charging the government with being complicit in perpetuating the subject falsehoods, is a position lacking substance.  It is one thing to be told that a delinquent borrower seeking a short sale approval from a mortgagee bank intends to have a corporation "related to [him]" in some undefined fashion buy the property and to somehow seek to realize a profit from the process on the one hand, and to be asked specifically by the prosecutor whether he was told (1) by Joseph that "the company selling the property . . . was owned by his brother-in-law," (2) by Sofia "that the company was owned by a relative of hers" and (3) that the "special purpose company that was created to buy 83 Cathedral Avenue was owned by relatives of Sofia and Joseph Atias" on the other hand.  Simply put, the specific questions asked by the government of Strain were different than the general information told to the witness

-43-

by Joseph in November 2011.  This lack of parity renders the perjury claim bogus.

Defendants seem to argue that Strain had an obligation to advise Joseph during their negotiation sessions that realizing a profit from a short sale was wrong.  (Sofia's June 2, 2017 Reply (Doc. # 253) at 19.)  But that, of course, is irrelevant to the issue of perjury.  Moreover, as Strain correctly noted in the following exchange:

> Question: [y]ou didn't say you can't do that [i.e., profit from a short sale] did you?
>
> Strain:   It is not my obligation to tell him no, I can't give him advise.  I'm not his lawyer. He had a lawyer, and I expected that he was getting advice from that lawyer.

(Tr. at 1464.)

Attention will now be directed to the government's claimed failure to correct false testimony provided by Pellegrini.  Defendants proffer — in essence and in a conclusory fashion — that in several instances Pellegrini's testimony is not in sync with their understanding of what actually happened as to Counts One and Two thereby warranting a new trial.  (See Sofia's June 2, 2017 Reply (Doc. # 253) at 20-22.)  For instance, they contend that

> the Government knew or should have been aware that its primary witness, Nicholas Pellegrini, testified falsely.  Pellegrini testified that Sofia and Joseph Cohen signed the deed to 83 Cathedral Avenue over to Jefferson Real Property Management, Inc. . .

-44-

> . . Had it properly investigated the issue,
> the government would have known that
> Pellegrini was lying.  In the alternative,
> even if the government had no way of knowing
> about Pellegrini's perjury, it was material
> due to his centrality to the government's
> case and thus warrants the granting of
> Defendants' Rule 33 motion.

(Id. at 20.)

> The basis for the claimed perjury is explained thusly:
> Recently, defendants learned from Joseph
> Cohen that, though the signature on the deed
> appeared to be his, Cohen never signed the
> filed deed transferring ownership of 83
> Cathedral to Jefferson Real Property
> Management, Inc., on January 27, 2012.  In
> fact, Cohen transferred title to the property
> to his sister Sofia Atias on August 3, 2007,
> and was never the titled owner of the
> property at the time of the transfer to
> Jefferson Real Property Management, Inc.

(Id. at 21.)

If in fact Sofia was the sole record owner of the
property in 2012, whether her brother also signed the deed is of
questionable relevance.  And even if Sofia were to contend that
neither signed the deed based apparently on her recollection and
upon a post-trial interview with her brother, that may not
legitimately be equated with the conclusion that Pellegrini
committed perjury.  Cf. United States v. Sanchez, 969 F.2d 1409,
1415 (2d Cir. 1992)("Differences on recollection alone do not add
up to perjury"); United States v. Monteleone, 257 F.3d 210, 219
(2d Cir. 2001)("Simple inaccuracies or inconsistencies in
testimony do not rise to the level of perjury.").

Sofia also argues that Pellegrini committed perjury in testifying about the funding for the short sale. That argument is similarly conclusory in character and devoid of merit.

In sum, defendants' request for a new trial based on claimed perjury by Strain and Pellegrini, and the government's associated misconduct, is denied.

(b)    Government's Presentation of
        Evidence as to Count Four

Sofia contends that the "government's erroneous and misleading presentation of the evidence regarding the theft of government funds count violated the defendants' right to due process and deprived them of a fair trial." (Sofia's June 2, 2017 Reply (Doc. # 253) at 22; see also Joseph's July 12, 2017 Reply (Doc. # 256) at 1-2; Joseph's Dec. 1, 2017 Sur-surreply (Doc. # 281) at 1-4.)

The prosecution is said to have "materially mislead the jury by advocating for concealment and failing to report information as the standard to obtain a conviction under 18 U.S.C. § 641." (Id.) However, a review of the governments proof (and the Court's charge) as to Count Four belies that claim. In essence, defendants accomplished the charged theft via a pattern of "concealment" and "fail[ures] to report" such as, for example, not checking the "self employment" box on the medicaid forms and deciding not to report to DSS the approximately half million dollars received following the passing of Sofia's father and the

-46-

consummation of the bank fraud under Counts One and Two.

Defendants' related argument that the government mislead the jury by its lines of inquiry and by statements made during summation are similarly unconvincing.  The government's questions and comments about discrepancies between the testimony provided by the government witness Griffin of the Nassau County DSS and defendants' expert witness, Adamo, do not provide a predicate for a new trial.  Among other things, Adamo opined that certain unreported, seeming available assets would not necessarily render defendants ineligible for medicaid absent further investigation.  But, of course, further investigation was not possible absent the department being made aware of the subject items by the Atiases truthfully completing the medicaid application and recertification forms.

The jury heard from both Griffin and Adamo.  Defendants maintain that "Griffin [after being recalled by the government in rebuttal, on cross-examination by the defense] admitted that everything that Adamo had said was accurate except for [her] testimony 'regarding bona fide loans.'" (Joseph's July 12, 2017 Reply (Doc. # 256) at 3.)  From that, it supposedly follows that Adamo's testimony stands uncontradicted thus rendering the government's proof inadequate as a matter of law as to the threshold issue of eligibility.  (See id. at 3-4.)  But such is not the case for a number of reasons, including (1) as correctly

noted by the government in its October 27, 2017 submission, defendants' view of Griffin's testimony does not dovetail with what Griffin actually said[14], and (2) there was abundant evidence before the jury — independent of Griffin's testimony including, e.g., the completed medicaid applications submitted by defendants and accompanying instructions – to support their guilty verdict.

In sum, the governments's presentation of its evidence as to Count Four was proper as were the prosecutors' questions as well as their comments during initial and rebuttal summations.

10.  Advice of Counsel

"By initially forbidding defendants [, it is argued,] to use the phrase 'advice of counsel,' and then permitting defendants to have a jury instruction on the theory, the Court prevented the defense from fully developing the theory from the beginning of the trial." (Sofia's June 2, 2017 Reply (Doc. #

---

[14] "When Griffin was asked whether anything defendant's expert witness said was not accurate, she did not say, as defense counsel alleges, that 'everything that Adamo had said was accurate except for Adamo's testimony 'regarding bona fide loans.' (JA [7/12/17] Reply [Memo] at 3). Rather, Griffin said 'there were a few things, yes.' (Tr. 3164, line 2.)  Griffin spoke about bona fide loans first but when she asked 'Do you want me to proceed?' (Tr. 3164, line 13) presumably with the rest of the 'few things,' defense counsel focused on 'what you are talking about now' and never returned for the rest of the list of a 'few things' referenced by the employee from Nassau County Department of Social Services." (Gov't's Oct. 27, 2017 Surreply (Doc. # 276) at 4; see also  Joseph's Sur-surreply (Doc. # 281) at 3 (indicating that the government's understanding of the portion of Griffin's testimony under discussion is accurate).)

253) at 26.)

No cites to the record are provided as to the Court's order or orders of preclusion.  However, it appears that the relevant portion of the record runs from pages 37 to 50 of the transcript wherein I instructed the defense, after a lengthy discussion, to confine its usage of the term "advice of counsel" to Pellegrini during their openings since it was questionable at that point whether attorneys Lee or Strain would be called as a witness, and more importantly, whether, if called, their interaction with either defendant would give rise to the advice of counsel defense.  "However, [the Court told] the defense [that they] may indicate to the jury, if they elect to do so, what defense counsel believes the evidence will show concerning what Strain or Lee said to either or both of the defendants" during their openings as bearing on their respective states of mind; just don't link such comments to the term "advice of counsel" with respect to Strain and Lee.  (Tr. at 43.)

Defendants have not shown specifically how the limited pre-opening restriction the Court placed on defense counsel negatively impacted the presentation of their case.  Simply saying it did, absent specificity does not make it so. Tellingly, defendants do not complain that their efforts to pursue an advice of counsel theory during their examinations of Sofia, Joseph, Pellegrini, Strain or Lee were improperly curtailed or that the

Court's charge on the subject was erroneous.[15]  For the above reasons, this predicate for defendants' Rule 33 motion is found to be devoid of merit.

## 11.  Court's Rulings During Cross-Examination of Two Witnesses

"The Court [, the defense maintains,] twice violated Defendants' right of confrontation, in arbitrarily curtailing the cross-examination of witness Pamela Lee, and in preventing Joseph Atias's counsel from asking leading questions of Sofia Atias." (Sofia's June 2, 2017 Reply (Doc. # 253) at 30).

I have reviewed the two incidents referenced by perusing the pages cited, to wit, Tr. at 3099-100, 3108, and 1940-41.  Having done so, I believe each ruling represented an appropriate exercise of my discretion under Federal Rules of Evidence 403 and 611.  Rather than addressing the matter further and given the straightforward and concise nature of the portions of the record involved, the reader is referred to the cited pages which speak for themselves.

## 12.  Government's Production of Exculpatory Information

Defendants claim that the government failed to turn over exculpatory information in violation of its obligation under

---

[15] Parenthetically, the Court notes that its advice of counsel charge was taken from 1 Leonard B. Sand, et al., Modern Federal Criminal Jury Instructions, Instruction 8-4, at 8-19 (2017), which was instruction was recently approved by the Second Circuit in United States v. Scully, — F.3d —, 2017 WL 6346657 at * 9-10 (2d Cir. Dec. 13, 2017).

<u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963).  That failure is said to relate "to materials that, if properly disclosed, would have allowed the Atiases to argue that, rather than being co-conspirators with Pellegrini, they were deceived by him and would have further supported the defendants' position that the Atiases lacked the knowledge of the fraudulent scheme and inten[t] to defraud the bank." (Sofia's June 2, 2017 Reply (Doc. # 253) at 27.)

The two exculpatory items not provided to the defense are claimed to be:

> First, the government failed to turn over exculpatory information for Rachel Amsellem's (Amsellem's") second pretrial interview, where she disclosed that she had told the prosecutors that some of her signatures were forgeries [and] . . . . [t]he other [or Second] <u>Brady</u> violation concerns the untimely disclosure, right before trial, of the filed deed transferring 83 Cathedral Avenue from Sofia Atias and her brother Joseph Cohen to Jefferson Real Property Management Inc.  The late disclosure precluded defendants from properly investigating the nature of the document and presenting evidence that Pellegrini forged the document and lied during trial about Sofia Atias and her brother signing the deed notarized by a Michele Dobbs.

(Sofia's June 2, 2017 Reply (Doc. # 253) at 27-28.)

These two items will be discussed in turn.

(a)  Information About Government's Second Pretrial
Interview With Amsellem

The government's response as to this item is that "no

notes" were taken during the second interview and that, in any event, "no material exculpatory information was provided at that session." (Gov't's Oct. 27, 2017 Letter (Doc. # 276) at 3.)

Initially it warrants mention that defendants are not complaining about "notes" not being furnished but rather about exculpatory "information" not being provided following the second Amsellem interview. Accordingly that part of the government's response is off-target.

The information under discussion, however, has not been shown by the defense to be <u>Brady</u> material. As explained by the Second Circuit in <u>United States v. LeRoy</u>, "[e]vidence is not 'suppressed' if defendant knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." 687 F.2d 610, 618 (2d Cir. 1982), <u>see also</u> <u>United States v. Barcelo</u>, 628 Fed. App'x 36, 39 (2d Cir. 2015)(because "[defendant] Barcelo knew that Arellano [, a potential witness,] was present during the traffic stop and might have useful evidence . . . that evidence was not 'suppressed.'").

Here, "the government provided [to defendants], as 3500 material, a typed report of an interview with Amsellem wherein she claimed that 'she signed numerous documents above where her name and the name Jefferson Property or Real Property appeared or where it described her as an officer of Jefferson.' Sometime before trial, the government re-interviewed Amsellem, and was

told that some of her signatures were, in fact, forgeries, contrary to her earlier statements." (Sofia's June 2, 2017 Reply (Doc. # 253) at 27(internal citations omitted). Defendants complain that this modification by Amsellem was not relayed to them.[16] Given the attendant circumstances, that scenario does not constitute suppression for Brady purposes.

A simple reading of the Superseding Indictment indicates the grand jury's conclusion that "Jane Doe # 1" signed multiple documents to effectual the bank fraud. From the description in the accusatory instrument of Jane Doe # 1 it is evident that she is Amsellem, Sofia's then teenage daughter. That Sofia controlled the relevant actions of her daughter as to the charged, now established criminality, or at the very least that there was no impediment to communication between the two of them, is evidence by pivotal role Amsellem played in the fraud and by the fact she provided post-trial affidavits in support of her mother's and stepfather's current motions. (See Ex. 15 to Sofia's June 2, 2017 Reply (Doc. # 253) Amsellem's May 30, 2017 and June 2, 2017 Affidavits).)

The notice provided to defendants of the central role said to have been played by Amsellem as set forth in the indictment, considered in conjunction with the relationship

---

[16] Information as how and when defendants learned of the second interview is not provided by movants.

between her and defendants, essentially eviscerates the defense claim of a <u>Brady</u> violation.  If defendants wanted to learn about her first or second interview with the government concerning her actions as alleged in the accusatory instrument, they could have asked her.  If defendants believed she had exculpatory information, she could have been called to testify which, of course, she was not.

In essence, as <u>LeRoy</u> and <u>Barcello</u> instructs, the government's failure to advise defendants of the modified position taken by Amsellem at the second interview – if that is what the government did – was not violative of <u>Brady</u>.

(b)  Government's Disclosure of Filed Deed Transferring Title From Sofia Atias and her Brother to Jefferson Real Property Management Inc.[17]

A perusal of the Superseding Indictment discloses that the transfer referenced in the caption was central to the counts of bank fraud.  So this is not a situation in which a defendant was deprived of notice of a key document until the "eleventh hour," i.e. until it was to late to be effectively used at trial.  Its materiality was obvious from the outset.  Moreover, the deed is a public document, readily accessible to all including defendants.  If, after reading the indictment, Sofia or Joseph had questions, inter alia, as to authenticity of the signature of

---

[17]  The subject deed was received into evidence at trial without objection.  (Tr. at 1259.)

-54-

Joseph Cohen or of the notary, they were in as good, if not better position than the government to make appropriate inquiries.

Additionally, defendants advise that the subject deed was not "provided until shortly before trial." (Sofia's June 2, 2017 Reply (Doc. # 253) at 29.) Precisely how much before is not indicated, nor is the reason that its purported late production precluded its claimed exculpatory nature from being communicated to the jury.

In sum, neither the results of the Amsellem's second interview, or the deed to Real Property Management Inc., constitutes Brady material. And if, contrary to fact, a Brady violation occurred, it would not warrant the granting of a new trial. No prosecutorial misconduct has been shown. In view of the overwhelming evidence supporting the jury's verdict as to the subject counts, there is no "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." Turner v. United States, ____ U.S. ____, 137 S. Ct. 1885, 1893 (2017)(internal quotations marks and citation omitted).

13. Court's Challenged Rulings During Defendants' Cross Examination of Pamela Lee, and Court Precluding Leading Questions of Sofia Atias by Joseph Atias's Counsel

(a) Cross Examination of Lee

Lee, it will be recalled, is the attorney from upstate

New York who counseled Joseph on the laws and procedures pertaining to real estate short sales in July 2011 before Pellegrini entered the picture.  She was called as a rebuttal witness by the government. The thrust of her testimony was outlined earlier. To partially reiterate, the jury learned, as a result of the defendants' cross-examination, that Lee was under suspension from the practice of law for several significant escrow violations.  (Tr. at 3099-107.)  Defense counsel then sought to further attack her general credibility by eliciting information about additional escrow violations leading to her suspension.[18]  At that juncture, I stopped the line of inquiry as cumulative pursuant to Federal Rule of Evidence 403.  (Id. at 3108.)  Left unexplained by defendants is an explanation – beyond stating several axiomatic general principles of the Sixth Amendment jurisprudence – why the curbed further attack was "arbitrary and violative of the confrontation clause."  I thought then that my ruling was an appropriate exercise of my discretion and nothing in defendants' succinct discussion of the subject suggests otherwise to me now.  See generally Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)(Courts possess "wide latitude . . . to impose reasonable limits on such cross-examination based

---

[18]   The Court notes that the Appellate Division, Second Department's suspension order is in evidence as defendants's Exhibit DDD.  (Tr. at 3101-02; see also id. at 3107 (Lee admits exhibit accurately sets forth her escrow transgressions).)

on concerns about, among other thing . . . interrogation that is
repetitive or only marginally relevant.").

    (b)  Precluding Leading Questions by Joseph's
        Attorney of Sofia

    Although co-defendants Joseph and Sofia are separate
and distinct parties — here, unlike in some situations — they
presented an essentially unified defense.  Indeed, a reader of
the record would be hard-pressed to uncover instances in which
Joseph and Sofia proceeded other than in virtual lockstep.

    Granted, cross-examination via leading questions is
pivotal to the fact finding process.  But here Joseph's counsel
was not examining "a hostile witness, an adverse party or a
witness identified with an adverse party."  Federal Rule of
Evidence 611(c).  While that fact alone, of course, does not
necessarily preclude the use of leading questions, it is a
germane consideration.

    Joseph's defense counsel commenced his cross-
examination of Sofia at page 1912 of the transcript.  What
followed was a series of leading questions — often not
preliminary in nature — almost invariably calling for, and
receiving a one-word response. (See id. at 1912-21.)  That
pattern persisted until the following question was asked and
colloquy occurred:

    Q.  Now, Joe didn't insist that you keep your children on
    your ex's Medicaid plan, he insisted they be put on his
    private insurance?

MR. KELLY:    Objection.

THE COURT:    Sustained.

It would be easier to hear from the witness rather than her going yes or no.

MR. SCHWARTZ: She's not my witness.  I'm entitled to cross-examine.

THE COURT: I'm telling you.  What's happening is you're making these categorical statements and asking yes or no.  It would be more helpful to the jury if you asked questions which are more open-ended.

(Id. at 1921; see also Tr. at 1940-41 (colloquy between counsel and Court referenced at page 31 of Sofia's June 2, 2017 reply (Doc. # 253)).)

Given the symmetry of Joseph's and Sofia's defense to the charges in the indictment and the basically mini-summation points embodied in counsel's leading questions on matters of substance, I believe the challenged rulings were not erroneous but rather fell within the appropriate exercise of my discretion.

Accordingly defendants' Rule 33 motion under this ground pertaining to Joseph's cross examination of Sofia, along with the challenge to limitations placed on the cross-examination of Lee, are found to be without merit.

14.  Possible Informal Assurance by Government to Strain

In Joseph's July 12, 2017 Reply, he opined that "[b]ased on the Government's questions and Strain's answers to

those questions, it is likely that, prior to taking the witness stand, Strain — or at least Strain's attorney — spoke with the Government about Strain's upcoming testimony.  It is also likely that Strain's attorney was aware that the recorded conversations were potentially damaging to Strain . . . ."  (Joseph's July 12, 2017 Reply (Doc. # 256) at 23).  A solution to Strain's supposed "dilemma," Joseph proffers, would be for the government to provide "an informal, unrevealed assurance . . . that he would not be prosecuted"; if such an assurance was made, the government had "an obligation to disclose it to the defense."  (Id.)

The operative word in the last sentence is "if."  As best as I recall, neither defense counsel broached the subject with Strain during their extensive cross-examinations.  More to the point, however, the government, in its October 27, 2017 Surreply indicates that "[n]o such assurances were ever given or ever requested."  (Gov't's Oct 27, 2017 Surreply (Doc. # 276) at 2.) There is nothing before me to suggest that assurance is inaccurate, thus concluding the matter.

15.  Pellegrini and Emails

The final Rule 33 ground asserted by Sofia reads, in toto:

> During cross-examination of Pellegrini, he was asked if he had been asked to produce any "emails that you had with Mr. Ruano or any of the other parties we have been talking about in regards to the short sale?"  (Tr. 1219). He replied, "I believe so," and added "I

-59-

produced everything I have."  (Tr. 1219). Defendants received but one email of Pellegrini's in discovery.  If Pellegrini was being truthful., then the government improperly withheld emails.  If he was lying, then the government would have known that he did not turn over emails and the government failed to correct such false testimony.

(Sofia's June 2, 2017 reply (Doc. # 253)at 31.)

Sofia's complaint based on the above recitation is found in the section's caption which reads: "The Government Failed To Correct Pellegrini's Testimony That He Provided Emails to the Government."

Construed most favorably to defendants, it appears there may have been some internal emails generated by, or received by one or more individuals in Zarate's office about the closing of the subject short sale.  Or, it may be that Pellegrini's "belie[f] that more than one such email existed" or that he "produced everything" he had to the government was mistaken given the multiple years separating the events in question and his trial testimony.

Had defense considered this a significant issue, additional questions could have been asked of the witness about, inter alia, the nature and substance of the communications, and when and to whom in the government the additional email or emails were furnished.  The defense could have also sought clarification and, if necessary corrective action by the prosecutors with the assistance of the Court.  But none of the foregoing was done.

Instead the subject was raised for the first time via the current
Rule 33 motion.  To grant that motion, as earlier discussed,
would require a determination by the Court that it would be a
manifest injustice to let the guilty verdict stand." Sanchez,
969 F.2d at 1414 (internal quotation marks and citations
omitted).  The present ground nowhere nearly approaches that
formidable standard, whether consider alone or in conjunction
with defendants' other Rule 33 grounds previously addressed.

### DEFENDANTS' RULE 33 MOTIONS ARE DENIED

The various grounds urged in support of Sofia's and
Joseph's Rule 33 motions have been considered not only
individually but cumulatively as to each defendant.  But no
matter how viewed, movants' efforts, though presented by
experienced and skilled litigators, fall far short of justifying
the relief sought and, accordingly, the Rule 33 motions are
denied.

### CONCLUSION

For the reasons indicated, Sofia's and Joseph's Rule
29 and Rule 33 motions are denied.

SO ORDERED.

Dated: December 18, 2017
       Central Islip, New York

_____
DENIS R. HURLEY, U.S.D.J.